JUDGE TUCKER.
This is an appeal from a decree of the Richmond Chancery Court, dismissing the bill of the appellants, who are, first, the issue of the marriage between the defendants, Archer and wife, formerly Miss Tabb; the mother of that lady; and her brothers and sisters, ora part of them; praying that the estate of the defendant, Mrs. Archer, may be settled pursuant to certain marriage-articles, entered into between herself and husband, previous to their marriage, under which the appellants claim an interest as purchasers, and for general relief.
These articles executed under the hand and seal of the parties, both of full age at the time, in contemplation of their intended marriage, having been proved by three witnesses, and admitted to record in the County Court of Amelia, where the parties, or one of them, resided; no question can be made as to that fact. But as a great deal was said in the argument, as to an undue influence exercised by Mrs. Tabb, over her daughter, to prevail upon her not to marry Dr. Archer, unless he consented to execute such articles; I shall only observe, that Mrs. Tabb’s conduct, from the evidence, not only seems to me to stand-above every possible imputation of impropriety, but to have been highly laudable and proper, and such as every prudent and afEectionate parent, whether father or mother, would have done well to have pursued in such a case. Mrs. Tabb was guardian of her daughter by nature, and as such, the marriage of her daughter belonged to her, unless a testamentary *709 guardian *had been appointed by the father, or the guardianship of the daughter had been duly committed to some other guardian, (a) But it appears from the record, that she was actually her daughter’s guardian, whether by appointment by the father, or the Court, does not appear, and is perfectly immaterial. She was therefore in the strict line of her duty, when she was endeavouring to secure to her daughter, and her children the fortune committed to her care. That she refused her consent to the marriage after her daughter came of age, is perfectly immaterial ; it could not impede, or prevent the marriage. And the only penalty which it is alleged she proposed for disobedience, (though that is not proved, or rather is disproved,) was, that her daughler should be married at her house, or that she would not speak to her again. 15ven if these things were proved, I hold them of no consequence. A mother has a right to withhold her consent to any connection with her daughter which she does not approve of; and, whatever reasons or arguments she might tise, if there were no improper motives or inducements held out on her part, they are not impeachable here. With respect to Dr. Archer, whatever were his motives for first objecting to, and then consenting to, and executing the articles, there can be no doubt of his free agency; unless this Court should agree to set a precedent, for which I can find none, in any other place. The validity of the articles, therefore, I conceive, cannot be impeached; the endorsement by Dr. Archer puts this matter out of all doubt as to him, being made after the marriage. That endorsement could not, however, operate any thing as to Mrs. Archer, who was no longer sui juris.
Articles made in consideration of, and previous to, marriage, are considered as heads of agreement entered into between the parties for a valuable consideration ; a provision for the issue of the marriage is one of the great and immediate objects of this agreement; and consequently a principal intention of such agreement must be to secure such a settlement, as shall contain an effectual provision for that issue; which end it is clear cannot be answered by a settlement *so framed, as to leave it in the power of the parents to bar their issue by fine and recovery, or any other conveyance whatsoever. And the reason is, that the children of the marriage are considered as purchasers, (b) And therefore in articles on a marriage, to settle lands to A. for life, remainder to the heirs male of his body, by his wife, the articles being executory, and but as minutes, it has been decreed that the settlement should be made according to the intention, and consequently to the first son, &c. And the reason given is, that, if this construction upon marriage articles were not made, it would give way to fraud, and overreaching, and to the defeating of the manifest intention of the parties in settlements in which the issue of the marriage are considered as purchasers, (c) And marriage agreements are said to differ from all others in this; that the principal consideration is the marriage. Settlements are prudential acts done chiefly for this consideration: and the estate settled may be greater or less, according to the discretion of the parties: as soon as the marriage is had, the principal contract is executed, and cannot be set aside or rescinded; the estate and capacities of the parties are altered; the children born of the marriage are equally purchasers, under both father and mother: and therefore it has been truly said that marriage-contracts ought not to be rescinded, because it would affect the interest of third persons, the issue. It seems also agreed that there is this further difference between agreements, on marriage being carried into execution, and other agreements, that all agreements besides are considered as entire, and if either of the parties fail in performance of the agreement in part, it cannot be decreed against the other in specie, but must be left to an action at law; but j,n marriage agreements it is otherwise: for though either the relations of the husband or wife, should fail in performance of their part, yet the children may compel a performance; they being considered as purchasers and entitled to all benefit of the uses under the settlement, ^notwithstanding there has been a failure on one side, (d) And, although the rights of an infant, party to such an agreement, to real estate, may not, perhaps, be bound by any agreement in relation to it, unless there be issue of the marriage, (as there has been in this case,) yet, as to personals, her interest may be bound by agreement on the marriage; and if the parents or guardian cannot contract for the infant, so as to bind that property, the husband as to the personal estate, would be entitled to the absolute property in it, immediately on the marriage, (e) And Bord Ch. Hardwicke said, he knew of no precedent where a marriage agreement had been called in question, where it had been made (as in that case) with consent of parents and guardians: an observation which I make to save a repetition of what I have here said, in the cause which was heard at the same time with this. The force, obligation, and effect of marriage-articles is thus described by the Rord Chancellor in the case of Randal v. Willis, S Ves. jun. 273. “The marriage taking place upon these articles, and no other written document of the agreement between them, and the articles formally executed under real, whatever the rights of the parties are by the articles, it is totally impossible that any parties thereto could be discharged from any one obligation imposed by the articles.” Settlements varying from the articles have therefore been formed or set aside, (f) And articles being in their na *710 ture executory, ought to be construed and moulded in equity, according to the intention of the parties.(a) And, in the case of agreements in consideration of marriage, a Court of Equity will totally disregard the form, if the substance of the agreement and intention of the parties in making it can be got at; as in Cannel v. Buckle, (b) where a woman gave a bond in 2001. penalty to her intended husband, in which the intended marriage was recited, and the condition was, that, if it took effect, she would convey all her lands to her husband and his heirs; and though it was objected that this bond became void on the intermarriage, the Eord Chancellor said it is sufficient that the bond is a written evidence of the agreement of the *parties, and being upon a valuable consideration, (the marriage,) it shall be executed in equity; and that it would be unreasonable that the intermarriage, upon which alone, the bond was to take effect, should itself be a destruction of the bond. And the same point was before decided in the case of Acton v. Acton, (c)
The intent of the parties to an agreement may be evinced, either from the nature of the covenant compared with the substance of the agreement, or from the nature of the contract on which the covenant or agreement arises, considering who are the parties to it, and the object of their stipulating, (d) “The most apt instances of this sort, that occur, are in the cases of marriage-articles, wherein, although lands are expressly covenanted to be conveyed to one for life, with remainder to his heirs male of his body, which, on a contract executed, would give to the party an estate tail; yet, on a bill brought for the execution of articles, the lands will be directed to be settled upon A. for life, with remainder in strict settlement, upon his first, and other sons in tail male, &c. because, from the nature of the contract it is clear, that the issue of the marriage are principally in the consideration of the parties, and that the contract is made with a view to secure to them the estates stipulated about, and of which they are purchasers, in consideration of the » marriage. It is considered, therefore, that' it would be a strange and a vain construction of such contracts, if the principal contracting, and who is evidently the person meant to be restrained thereby, should be intended to have such an estate by them, as would enable him the very next day after their execution to defeat, by a fine, the limitations to his issue, with a view to secure which limitations the contract was entered into, and a valuable consideration paid for it.”
*Nor are the issue of the intended marriage the only persons to whom the consideration of the marriage extends. In the case of Jenkins v. Remys,(e) it was held that the marriage and marriage portion of the first wife, for whose issue by the intended marriage a provision was expressly made by a settlement, with remainder to the heirs of the body of the husband, did extend to the issue of the husband by a second wife. So in the case of Newstead and others v. Searles and others, (f) a widow on her marriage, with the participation and consent of her intended husband, made a settlement of her own estate, in favour of the issue of her former, marriage, in fee, with a proviso, that, if there should be any issue of her intended marriage, they should have an equal share of her estate. There was no issue of the second marriage; and Eord Hardwicke declares that the issue of the first marriage stood in the very same plight and condition, as against a mortgagee having a notice of this settlement, as the issue of the second marriage, if there had been any, would have done. So, in Goring v. Nash and others, (g) marriage-articles were entered into between a father and his son, on the son’s marriage, wherein, after several limitations, there was a limitation in favour of one of the daughters of the father, (not the eldest,) whereupon it was objected that she was a mere volunteer, as not being the issue of the intended marriage, but only a daughter of the father. Eord Hardwicke said, all the decrees.for the specific performance of marriage-articles, on limitations to younger children, were authorities in favour of the daughter of the father; and where such articles have been decreed at all, they have been carried into execution even as to collaterals, and not carried into execution in part only. “Suppose,” said he, “in the present case a bill had been brought by R. E. jun. (the son), or the widow, must not this particular limitation have been decreed to the plaintiff (the daughter of the father) at the same time?” And he said n,early the same thing in the case of Newstead v. Searles. (h) In the case of Vernon v. Vernon, which was a bill for the specific performance of marriage-articles, whereby lands of a certain value were agreed to be settled on the husband and wife, and the issue male of the marriage; remainder to the brothers of the husband, who were the plaintiffs, in which it was objected that the articles as to them were merely voluntary, and not within any of the considerations therein expressed, yet the Eord Chancellor decreed in their favour, and, upon an appeal to the House of Eords, that decree was affirmed, (i) The case of Eech-mere v. Carlisle, (k) was, where a bill was brought by the nephew and heir of Eord Eechmere, deceased, to compel a specific performance of marriage-articles, whereby a certain sum of money was agreed to be *711 laid out in lands, to be settled to the use of Lord Lechmere for life, without waste, with divers limitations over; remainder to Lord Lechmere in fee. The defendants, by their answer, insisted that Lord Lech-mere intended only a provision for the lady and the issue of the marriage; and that the limitation of the remainder in fee to the right heirs of Lord Lechmere, ought not to be carried into execution in his nephew’s favour, the articles as to him being merely voluntary. Sir Joseph Jekyll, Master of the Rolls, after taking a full view of all the various cases upon the subject, decreed in favour of the nephew ;* and his decree was, upon that point affirmed by Lord Ch. Talbot, (a) And the Lord Chancellor in delivering his opinion in that case observed, that “it was then a' settled point, that where the securities are appropriated, money agreed to be laid out as land shall go as land, not only to the issue of the marriage, but likewise to a collateral heir, or general remainderman, unless there appears some variation in the parties’ *intent.” A fortiori the land itself. For, as was said by Lord Ch. Mac-clesfield, in EJdwards v. the Countess of Warwicke, (b) the objection that the plaintiff claimed under a a voluntary limitation did not hold, inasmuch as it had been held, that the consideration for the precedent limitations in a marriage settlement, had been applied even to the subsequent ones; as where, in consideration of a marriage and portion, land had been settled on the husband for life, and then to the wife for life, remainder to the children, with remainder to a brother; these considerations have extended to the brother, as was in fact afterwards done in the case of Vernon v. Vernon, before mentioned; so that, if that case required the support of a precedent, one might probably have been found. And this is agreeable to what Lord Hale is reported to have said in the case of Jenkins v. Keamish,(c) that the consideration of the marriage, and the marriage portion, will run through all the estates raised by the settlement, though the marriage be not concerned in them, so as to make them good against purchasers, and to avoid a voluntary conveyance;(d) and though Lord Mac-clesfield, in the case of Osgood v. -Strode, (e) said, “the marriage and marriage portion supported only the limitation to the husband and wife, and their issue, which was all that could be presumed to have been stipulated for by the wife or her friends;” yet, it must be observed, that in that case, neither the wife, nor her issue, nor anj of her friends were parties; but the contest was between a nephew, in whose favour there was a limitation in the articles, and the heirs at law of the father and son, by whom these articles were entered into on the son’s marriage; and there was a decree in favour of the nephew, against the heirs at law. And the settlement was directed to be moulded in such manner as to provide for all the branches of the father’s family, (from whom the estate settled moved,) according to the apparent intention of the father, (f)
Jn the case of Le Neve v. Le Neve, as taken from Mr. Forrester’s MS, (g) where, by marriage-articles, the issue of that marriage were to have the estate in such manner as *Edward Le Neve, the father, should, by deed or will appoint ; and no direction how the estate should go for want of appointment; but .only, in default of issue, to Edward and his heirs; so that, if the plaintiff should die without issue in their father’s life, their representatives would be entitled to nothing. Lord H. said, notwithstanding this, he thought the plaintiffs entitled to some relief, as the other part of that contingency might happen, and decreed a conveyance accordingly. This has satisfied the doubt in my mind, whether the collateral relations and mother of Mrs. Archer were entitled to ask for a settlement pursuant to the articles.
And where it appears by the marriage-articles, that, in the settlement proposed to be made, the parties to the marriage are to take an estate for life, instead of an es<ate-tail, a fine levied by the husband, (who was absolute owner of the premises in fee-simple, at the time of the marriage and entering into the articles, but was to have been tenant for life only, with remainder to the issue male of the marriage, and the heirs male of such issue male, lawfully begotten, with remainder to his own right heirs,) was considered as no bar to Ihe eldest son of the marriage, although the uses of the fine were declared to be for the second and other sons of that marriage, and although the eldest son, as heir to his father, inherited other very large estates, (h)
Length of time also appears to be no bar. In the last mentioned case, near fifty years had elapsed from the date of the articles, and upwards of twenty-five years from the date of the fine. It appeared that the articles had been thrown by for several years as useless, being found in the bottom of an old trunk after Sir John Trevor’s death. But Lord Ch. Parker disregarded these circumstances, saying that if, within two years, (the time mentioned in the articles within which Sir John Trevor agreed to make the proposed settlement,) the wife’s trustees had called for the settlement, or had brought a bill to compel the performance of the marriage-articles, there would be no question that the Court would have decided the settlement upon Sir John Trevor '^for life, &c. according to the intention of the parties, (i) The same doctrine as that last mentioned, was held by the Master of the Rolls, in Lechmere v. Lord Carlisle, (k) viz. that Lord *712 Eechmere was'compelled in equity to ful-fil the articles, and, having lived after the year within which time the lands were to have been purchased and settled, without doing it, he had broken his covenant; and the trustees might thereupon have brought their bill immediately to compel him to make such purchase and settlement. And although in common cases of a breach of covenant, the parties may be left to their action at law for damages, yet the power of a Court of Equity to carry marriage-articles into execution, notwithstanding a breach on either side, seems not to be doubted, for the specific execution of articles, being the most adequate justice in general, shall not be left to an action at law. (a)
Marriage-articles being in their nature executor}’ only, it has been determined that a covenant therein contained to stand and be seised of the premises, until such time as a further assurance should be thereof made to the uses of the said articles, could not be taken as a final settlement, (b)
This view of the principles by which Courts of Equity are governed, in respect to marriage-articles, may furnish us with a guide to the decision of the case before us.
The marriage-articles, to which Dr. Archer and his present wife are the only parties, recite ‘ ‘that, whereas a marriage is intended to be shortly had and solemnized between the parties thereto, and they have mutually agreed that all the estate, both real and personal, to which the said Frances is entitled, shall be secured to, and settled upon her and her heirs, except as therein after excepted. Now, in consideration of the said intended marriage, and for the intent and purpose aforesaid, the said J. doth thereby covenant and agree to and with the said Frances, that all the aforesaid estate, both real and personal, (consisting of sundry plantations, slaves, stocks of horses, cattle, &c. except as therein excepted,) shall remain in the right and possession of the said Frances, during the *continuance of the said intended marriage; and the annual proceeds thereof, only, shall be applied to the support and maintenance of the said J. and F. and their issue, if any there should be. 2dly. The said John doth thereby further covenant and agree to and with the said Frances, that he never will sell or dispose of any part of the said real or personal estate, (except as before excepted,) in any manner whatsoever: But the same shall always be held as an inviolable fund for the support and maintenance of the said John and Frances, and their issue, if any there should be of the said intended marriage, applying only the proceeds, or profits, without renting or applying any of the original stock for that purpose: But the whole of the said original stock (except as therein excepted) shall be inviolably held, for the use and benefit of the said Frances and her heirs, in the same manner as if the said intended marriage should never take effect. By which expression it is meant and understood between the parties, that if the said John should depart this life, leaving issue of the said marriage, and the said Frances should again intermarry, and leave issue, such issue shall be equally entitled to the benefit of this settlement, as the issue of the said intended marriage would be; and, in the event of the death of the said Frances, without issue, then the whole of the aforesaid estate, both real and personal, (except as before excepted,) shall go to her next legal representatives.” On the back there is an endorsement, of which I shall take notice presently.
It was objected to this instrument, that, if it were any thing, it was a marriage settlement, and not merely articles; that it was therefore an agreement already executed between the parties, and not merely executory, as articles are; that, being already executed, it must be left to its legal operation and construction; that the Court could not interfere to direct any other settlement, since that would, in effect, be to change the agreement between the parties. To these objections an answer perfectly satisfactory was given *by the counsel for the appellants; that there is no covenant, or grant, or any words capable of passing an interest, or of declaring that she will stand seised to the uses in the instrument mentioned, or of creating a use, or trust, on the part of Mrs. Archer. The "covenants are entirely on the part of the husband; and whether the object of these covenants be executory or not, yet, as it appears that the husband has actually broken his covenant, by executing a voluntary conveyance for the land, and taking back a conveyance to himself, in exclusion of the wife and her issue, (to provide for whom, whether of that or any future marriage, was manifestly the object and intention of the articles,) that objection ought not to prevail. And the case of Rechmere v. Carlisle(c) is a strong authority to .shew, that, whenever there is a breach of any covenant contained in marriage-articles, a Court of Equity will interpose its aid, to enforce a settlement to be made pursuant to the intention of the parties, as it may appear from the articles; provided the application for the aid of the Court be made in behalf of such persons, whose interest, whether immediate or remote, was within the consideration of the marriage, as in the case of the issue of Doctor Archer and his wife, now before us, who, in my opinion, are well entitled to have such a settlement made, as was manifestly the intent and meaning of the parties, as expressed in, oras may be collected from, the articles themselves.
The counsel for both parties have contended, on their respective parts, for an exposition and interpretation of the articles, by evidence dehors the articles themselves. The counsel for the appellants rely on Mr. Giles’s deposition, and some further evidence, altogether parol; their adversaries claim the benefit of the endorsement, made by Dr. Archer and his lady, upon the articles, some time after the marriage. I am of opinion, that both ought to be rejected, in the present case., The only effect of that endorsement, I conceive, is to prove, (if such proof were wanting,) *713 that there was no fraud or surprise upon Dr. Archer in the original execution of these articles. With respect to Mrs. '*Archer, they could have no effect; she was no longer sui juris; no longer capable of contracting with, or of explaining a contract made with, her husband; being equally incapable of being a witness for or against her husband, as of contracting with him. The endorsement, to have any operation with regard to her, must operate in one or other of these modes. With respect to parol testimony, I can discover no such ambiguity in these articles as to require or permit a resort to it. I have, on a former occasion, expressed my reasons pretty much at large for rejecting parol testimony to explain the meaning and intention of parties in a solemn covenant, or even in written agreements, (a) I will not repeat them, though I still feel their full force; and conceiving that the articles themselves are sufficiently inteligi-ble, as containing words which have, in themselves, a positive, precise sense, I have no idea of its being possible to change them: and shall add, upon the authority of Dord Thurlow, that I take it to be an established rule, that words cannot be changed in that manner, (b)
Erom the various cases upon the subject of marriage-articles, I think one general rule may be collected, which I do not recollect to have found precisely laid down, in any one. It is this: that, whenever in marriage-articles a settlement is proposed to be made, if there be any casus omissus or chasm in the uses, or estate intended to be settled, such casus omissus or chasm shall be supplied by the Court according to the intention of the parties, if possible to be collected from the instrument; if not, then from the rules of law, or the usages customary in such settlements. Thus, where the uses expressed in the articles have gone no further than to limit an estate-tail to the issue of the owner of the estate, it was held that the equitable reversion in fee descended upon the heirs general of the grantor; and it would seem that a settlement was directed accordingly, (c) So where money, part of which was the husband’s, and part the wife’s, was on the marriage agreed to be laid out in land, and settled on the husband for life, remainder to the wife for life, Remainder to the heirs of their two bodies; and the uses went no further; it was decreed that the heir of the husband should have the whole (notwithstanding the wife survived him) after the wife’s death, upon the presumption that it was so intended, (d) And this decree was cited and approved by the Master of the Rolls, in Dechmere v. Carlisle.(e) So, where articles on a marriage were to settle lands to A. for life, remainder to the heirs male of his body by his wife, the articles being executory, and but as minutes, the settlement should bo according to the intention and usual course in such cases, and consequently to the first son, &c. in strict settlement, (f)
Now the husband upon the marriage is a purchaser for a valuable consideration, and shall not be deprived of any of his legal rights, accruing upon the marriage, except such as he shall have expressly covenanted, or consented, to give up, by the articles concluded between him and his intended wife. In decreeing a settlement, therefore, to be made pursuant to these articles, the Court ought to inquire how far he has given his consent to this deprivation; beyond which this Court cannot go. Therefore if there be in the articles any contingency unprovided for, in the happening of which his legal rights, jure mariti, may take place without prejudice to the general scope and intention of the articles, and to the interests of those who are within the consideration of them, the settlement to be made, in case of such contingency happening, ought, I conceive, to pursue the rules of law, so as to let him into the perception and enjoyment of those legal rights. And the same construction ought to be made in favour of the wife’s rights, accruing on the marriage : each party retaining in their fullest extent their respective rights accruing upon the marriage, which they have not, on a fair and liberal interpretation of the articles, according to the established rules of construing them in Courts of Equity, surrendered for the mutual benefit of themselves, and their issue, or of such other persons as are evidently within the consideration of the agreement. I wish to be understood as confining my observations to the construction *of marriage-articles, not as meaning to extend them to settlements, or any other agreements executed.
The articles contain two distinct covenants. The first relates, exclusively, to the continuance of the marriage; during which period the rents and profits only, are to be applied to the support and maintenance of the husband and wife, and their issue, if any. By the second, Dr. Archer covenants that he never will sell any part of the estate; (except as in the articles mentioned;) thereby devesting himself, completely, of all power of disposing of the same; (as in violation of that covenant he has done;) but that the same shall always be held as an inviolable fund for the support and maintenance of the said John and B’rances, and their issue, if any; only applying the proceeds or profits thereof, without resorting to, or applying, the original stock, &c.
Now the first covenant applying to the continuance of the marriage; this part of the articles may fairly be interpreted to relate to some future period, so far as relates to the application of the proceeds or profits of the estate; the support and maintenance of the husband is evidently contemplated therein, as well as that of the wife and their issue: and the original fund is to be held inviolably for all those purposes. The provision for the husband is not limited to the continuance of the marriage, any more than the provision for the wife, or the children; it must therefore be for life at least; subject, however, to the *714 claims of the issue for a proper support and maintenance, if it should be withheld. The meaning then is, that Dr. Archer, in consideration of the marriage, and of the property left at his disposal by the articles, renounces his matrimonial rights to the rest of the estate of his intended wife; and, in lieu thereof, covenants and agrees to accept to the proceeds And profits thereof, only, for the support and maintenance of himself and family during the continuance of the marriage, and for the like support and maintenance of himself and the issue of that marriage in the event of his surviving his wife.
But if I am mistaken in this construction of the second covenant, and it should be that it relates only to a support *and maintenance for Dr. Archer, during the continuance of the’ marriage, then, 1 must observe that there is no provision made for the event of Dr. Archer’s surviving his wife, and therefore as there is issue of the marriage, Dr. Archer will at all events be entitled to be tenant by the curtesy of the lands, there being no covenant or agreement to surrender that legal right. But, under the fairest construction of the articles, I think he has agreed to accept the profits for life, of the whole estate, in lieu of the chance, only, of being a tenant by curtesy in the real estate.
The latter part of the second covenant, “that the original stock shall be inviolably held for the use and benefit of the said Frances and her heirs, in the same manner as if the said intended marriage should never take effect,” may seem to give room for a different interpretation of the preceding member of the covenant, were it not that the meaning of that expression is immediately explained, so as to leave ample room for the construction I conceive it ought to have; or if not, to leave room for the interpretation of the tenancy by the curtesy in the lands, which is nowhere covenanted to be surrendered, or given up, although it may be merged in the life-estate, which, according to my interpretation of the articles, Dr. Archer is entitled to. (a)
My opinion therefore is, that the Chancellor’s decree dismissing the bill of the plaintiffs ought to be reversed; that the defendants, Dr. Archer and his lady, ought to be decreed to execute a settlement of her estate- (except as excepted in the articles) to trustees to be named by the Court, in fee-simple, in trust to permit Dr. Archer, during the continuance of the marriage, to take and receive the rents, issues, and profits thereof, for the support and maintenance of himself, and his wife, and their issue, if any, and, from and after the determination of the marriage union, to permit the survivpr^of the said John and Frances to take and receive the rents and profits, in like manner, during his or her life, for the like purposes; and, from and after the death of the survivor, to hold the same to the' use of the issue of said Frances, and the descendants of such *issue, if any, there be, in equal portions, per stirpes, and not per capita: and, in case of the death of the said Frances, without issue of her body, and without any descendants, then and in that case, to the use of the heirs of the said Frances, who shall be then living, generally, in such portions as the law directs; subject, nevertheless, to the right of Dr. Archer to take and receive the rents, issues, and profits thereof, in case he shall survive his wife: that the several deeds and conveyances executed by Dr. Archer and wife, for the lands and slaves, &c. and the several deeds and conveyances executed by the persons to whom those deeds and conveyances first mentioned were made, be brought into the Court of Chancery, and there can-celled; and that the Court of Chancery take such further order, as to the records made of the proof of the said deeds and the recording thereof in the District Court of Peters-burg, and in the County County of-, as in the opinion of that Court will best answer the purposes of preventing fraud and imposition in consequence of the proving and recording those deeds.
JUDGE ROANE.
As the case of Randolph v. Randolph and others, not only embraces, perhaps, all the important topics on which the case of Tabb v. Archer and others turns, but also involves some important points ultra, I will first give my opinion on it: a few words will then suffice to declare my opinion on the other case.
I shall throw out of this case all the parol testimony going to explain the contract in question. Where there is a written agreement, the whole sense of the contracting parties is supposed to be comprised therein; and it would be dangerous to make any addition thereto, unless there was fraud in leaving out . something at the time ;(b) or unless there be a latent ambiguity which i’s impossible to be explained without the aid of the parol testimony. The last is not pretended to exist in this case; and as to the first, it is not shewn that any other terms than those comprised in the written contract were stated to, or assented to, by Dr. Randolph: if any thing intended by Mrs. Tabb has not *been inserted in this agreement, it is exclusively her own act, or that of her agent; and cannot affect the interest of Dr. Randolph. The construction of the contract must therefore depend exclusively upon the terms of the instrument itself.
Before I come particularly to the construction of the contract, I will dispatch some preliminary objections.
In the first place, it is objected that Mrs. Randolph was an infant at the time of executing the agreement, which, therefore, shall not bind her. The answer is, that infants may marry and as essential thereto, may contract by means of marriage settlements. In the case of Harvey v. Aston, (c) this position is established; and a settlement by an infant feme of IS, was held to be irrevocable in favour of the issue, and that the infant had not her election to waive the agreement at the age of 21. The same doctrine is expressly held in the case of Seamer v. Bingham, (d)
Again, it is objected that the agreement *715 in question was no act of the infant, Mrs. Randolph, but exclusively the act of her mother. The answer is, that the law has entrusted the father, or guardian, with the marriage of infant children, or wards, who ought not to do it to their disparagement: and, consequently, that settlements made by infants through them are binding; and it is further held that, even where the father or guardian acts corruptly or fraudulently, the agreement is not therefore to be set aside, and the children stript of the provision intended, (a) In the case before us there is, on the contrary, no pretence to say that the motives of the mother were interested, (however unusual such a course of conduct may be in this country,) or that she made any gain to herself by the contract in question. The settlement before us has no limitation in favour of herself or others of the Tabb family; as is the case in the cause of Tabb v. Archer.
As to the consent to this instrument on the part of Dr. Randolph and his wife, it is proved that they executed it freely; and it is probable, upon the testimony, that they *knew from an early stage of the courtship, that a settlement would be insisted on by Mrs. Tabb.
With respect to the settlement itself; it is held that in the case of articles before marriage, the provision for the issue being the immediate object of the agreement, Courts of Equity will execute them in strict settlement, so as to bar the power of the parents to defeat them by fine and recovery ;(b) and that, although the articles, by legal construction, would give an estate of inheritance to the husband or wife, yet they will be executed in strict settlement in favour of the issue on the ground assigned, (c)
To these positions I will add this; that the support of the husband and wife being equally objects of the marriage, to which the property belonging to each is naturally contributory, the rights of either thereto, accruing by the marriage, will only be lost by an express renunciation thereof, or by a renunciation arising from a plain and necessary implication; and that, as such a renunciation without consideration is unreasonable, we ought to lean in favour of a construction giving an equivalent. I have not found nor looked for any authorities on this point; but I hold it to be self-evident.
The case before us is a strong one for the application of this principle ; for, unless the husband gets a life-interest in the property, he gets almost nothing, although he married a lady with a large fortune. Ret us see whether there be any thing in the agreement which imports an absolute renunciation ; or rather, whether the renunciation of his marital rights is not in consideration of a life-interest in the whole estate, exclusively of the excepted property. It is of no avail to say that this construction, letting in the life-interest of the husband, postpones the vesting, or, rather, the enjoyment, of the limitation, in favour of the issue; that is but the common case, and such a provision for the husband, in general very just, is found in almost every settlement of the kind.
The agreement before us states its object, intent and purpose to be, to “secure and settle” upon the wife and her “heirs,” (construed to mean “issue” in order to further the intention of the agreement,) all her estate, except a *pittance particularly specified and excepted. The first remark I make on this part of the agreement is that this declared object is answered, although the husband is also let in to the enjoyment of a life-interest: for the covenant not to aliene, &c. secures the estate to the wife for her life, and the articles also settle the property upon, and vest it in, the issue, although the husband is construed also to have a life-interest: by this construction the estate is “secured” to the wife and “settled” on the issue in the language of the articles, although in the last case it may not be so soon enjoyed by them as if the life-estate of the husband should not intervene and had been expressly given up and excluded.
In furtherance of this declared object and intention, it is covenanted that the property aforesaid shall “remain in the right and possession of said Mary during the continuance of said intended marriage,” and the proceeds only be annually applied to the support of the said Bathurst and Mary, and their issue, if any be. The covenant thus far relates only to the continuance of the coverture. Dr. Randolph then goes on further to stipulate, that “he never will sell or dispose of any part” of the estate in question in any manner whatever, but that the whole thereof, shall be always held as an inviolable fund for the maintenance of said Bathurst and Mary, and their issue, if any there should be, applying only the profits or proceeds thereof to that purpose, without resorting to or selling any of the original stock, for that purpose, which shall be held for the use and benefit of the said Mary and her heirs, “in the same manner as if said intended marriage should never take effect. ’ ’
The first stipulation above mentioned relates only to the rights of the parties during” the continuance of the intended marriage. Every purpose in relation thereto would seem to be answered by the stipulation that the property should remain in the right and possession of the wife, during the marriage, and the proceeds only be applied to support the issue: after this it would perhaps be supererogation to stipulate that the husband would not sell the same during *the coverture. We must therefore to satisfy this last stipulation, apply it to events posterior to the coverture; to the rights of the husband in the event of his surviving his wife. In this relation it is, that Dr. Randolph stipulates that he will “never” sell or dispose of the property in question; (not that he will not do it during the coverture;) he also stipulates that it shall always be held as an inviolable fund for the support of himself and wife, (not that it shall be so held only during the coverture,) and their issue, if any ; applying the profits only as aforesaid. While these words are fully extensive enough to confer on Dr. Randolph the use *716 of the property for his life, for the covenant is not restricted to the duration of the coverture; they also guaranty to the issue of the marriage a support therefrom even after the death of his wife, and thus answer every equitable purpose in their favour. The concluding stipulation that the original stock shall be inviolably held for the “use and benefit of Mary and her heirs in the same manner as if said intended marriage should never take effect,” while it cannot be taken literally, for then the object of the settlement in favour of the issue of the marriage would be defeated, must be satisfied by a construction giving to the husband the use of the property for life in the event of his surviving, while his power of alienation being given up, the estate will ultimately remain to the wife and to her issue after his death. We must restrain the meaning of these last mentioned words in this manner, in order to effectuate the clear intention of the parties, to settle the estate in favour of the issue of the marriage, and reconcile it to the life-estate given to the husband in consideration of his marital rights as aforesaid.
I am thus inclined to think that, upon a fair view of the whole instrument, and especially, when we take into consideration the general principle before mentioned, that the enjoyment of the property of a husband or wife by the other, as the case may be, for life at least, is always intended *in settlements of this kind; the right of Dr. Randolph in the case before us to the use of the property for his life is recognised and admitted by the articles.
Such is my construction of the agreement in question. I therefore think the decree ought to be reversed; and one rendered calculated to settle the estate in controversy pursuant to the uses embraced by that construction.
Most of the grounds of my opinion in the case of Randolph v. Randolph and others, apply also to the case of Tabb v. Archer. The circumstances of this case are stronger against the claim of the appellees than those in Randolph’s case. For example; Mrs. Archer was of full age at the time of the contract; and therefore Mrs. Tabb’s consent was not essential to the marriage. The marriage might have been had without it: but indeed, Mrs. Archer herself required a settlement as a sine qua non of the marriage. Dr. Archer was also duly notified of this requisition, and on deliberation, acceded thereto.
As to the construction of the agreement there is no difference between this- case and the other, except that it provides |or the issue of any future marriage of Mrs. Archer, and in default of any issue by her, provides also for the next legal representatives of Mrs. Archer; whereas, in Randolph’s case, the issue of the contemplated marriage only was provided for. This general limitation in favour of the Tabb family might by possibility extend to Mrs. Tabb herself: but this possibility is too remote to fix on her any selfish or interested conduct which can in any degree affect the validity of the transaction. I should be of this opinion even if the contract had been negotiated by her: but this is not the case; it was the act of Mrs. Archer; and if any benefit results to Mrs. Tabb thereby, it is conferred bj' her daughter, and not by her own act. My opinion is, that the decree in this case is to be similar to that in the case of Randolph v. Randolph and others, except that it is to take in all the issue, by any marriage, of the appellee, Mrs. Archer.
*JUDGE FLEMING.
The case has been so fully and ably discussed by the Judges who have preceded me, that I shall only add that I concur with them in opinion, and unite in the decree which has been agreed upon in conference.
The following were the decrees entered in both cases, changing only the names of the parties. Those parts included within crotchets, thus, [ ] were inserted in the case of Tabb and others v: Archer and others, and omitted in that of Randolph and others v. Randolph and others. The additional matter to be found in the decree in the last mentioned case, is noted at the bottom of the page.
“The Court is of opinion that the issue of the said Prances Cook Archer, [either] born of her marriage with the said John Randolph Archer, [or any future marriage,] whenever they may come in esse, are in equity to be considered as purchasers, and within the consideration of the articles agreed upon and executed between the said [John Randolph Archer and Prances] his wife, then [Frances Tabb], previous to their intermarriage; to which articles,* [both parties being of full age at the time of the execution thereof,] no objection is perceived either on the ground of fraud or surprise; nor are the same liable to be impeached for any other reason. Marriage-articles are considered as the heads or minutes, only, of an agreement entered into between the parties, upon a valuable consideration, the marriage; and, being in their nature executory, ought to be construed and moulded in equity according to the intention of the parties at the time of concluding the same. As soon as the marriage takes place, the principal contract is executed, and cannot be set aside, or rescinded, the *estate and capacities of the parties being altered, and the children born of the marriage equally purchasers under both father and mother: wherefore it has been truly said, that marriage-contracts ought not to be rescinded, because it is impossible to reinstate the parties in their original condition, and because it would affect the interest of third persons, the issue; who, whenever they come in esse, or are even in ventre sa mere, are entitled to the aid of a Court of Equity to compel a performance, or to set aside an act done with intent to defeat their rights, which it was the object and intention of *717 the articles to secure: which intention can - never be answered if the parents are at liberty to dispose of the property agreed to be settled, on the marriage, so as to bar their issue by fine and recovery, or any other conveyance whatsoever. Whatever effect a conveyance by husband and wife may have upon the interest of the wife alone, as intended to be secured by marriage-articles, (concerning which it is now necessary to decide,) the interest of the issue, when intended to be provided for by the articles, cannot be affected thereby; it being impossible for the parties to the contract to be discharged from any one obligation imposed by the articles, For it would be a strange and vain construction of marriage-articles, if the principal party contracting, and who is evidently the person meant to be restrained thereby, should be intended to have such an estate by them, as would enable him the very next day to defeat the limitations to his issue, with a view to secure which the contract was entered into, and a valuable consideration paid for it. And, although this, perhaps, might have been one of those cases, where the articles alone, if the parties thereto had not attempted to defeat them, might have been sufficient to answer the purposes intended,‘without any settlement to be made pursuant thereto; yet the defendants in the present case, having done all that lay in their power to defeat the articles, the issue of the marriage and all others within the contemplation of the articles, are entitled to the aid of a Court of Equity, to '^'prevent that design from taking effect, by setting aside all the con-vej'ances made by, or to, the defendants for that purpose; and by appointing trustees, and decreeing a settlement to be made, pursuant to the articles, and to the intention of the parties, at the time of the contract; as the same may be collected from the nature of the agreement; the language and context thereof; the ordinary usage in similar cases; and the legal rights of the parties as they existed before, and would have existed after, the marriage, if no contract or agreement had been made between them, without resorting to parol, or other evidence dehors the articles to explain or vary the meaning thereof, unless there be some latent ambiguity therein, which is otherwise impossible to be solved or explained, or unless something agreed on by the parties at the time, has been omitted to be inserted therein, through fraud or accident, as in the case of Flemings v. Willis, 2 Call, 5. The endorsement made on the articles by the parties thereto, subsequent to the marriage, can neither be regarded as a part of the original contract, nor as an explanation thereof. The wife, after the marriage took effect, being no longer sui juris, or capable of making any contract with her husband, (but through the intervention of the trustees, which is not the case at present,) nor capable of giving evidence in his behalf. The evidence of Mr. Giles, who drew the articles, is considered as inadmissible for the purpose of explaining them, because it is conceived that the words of the articles, if the preceding rules for construing them be adopted, are too strong to admit of his construction, without contradicting, rather than explaining, them. The husband on the marriage being a purchaser for a valuable consideration, cannot be deprived of any of his legal rights accruing by the marriage, except such as (according to a just and liberal construction of the articles) he must be understood, and intended, to have given up, for the purpose of securing that provision for the wife and her issue, or other persons manifestly within the consideration of the articles, *who are intended to take as purchasers under them, which was the sole object of such an agreement; if, then, there be any chasm in the articles, whereby the legal rights of the husband, may, in certain events, interpose between the uses declared by the articles, a Court of Equity, in directing the settlement which is to be made, ought to have regard to those legal rights, so far as to preserve to the husband the enjoyment of them, in case of such events. And the same construction ought to be made in behalf of the wife’s legal rights, accruing also on the marriage, or existing antecedent thereto, and independent of it. For these reasons, this Court is of opinion, that the Court of Chancery erred in dismissing the bill with costs; therefore the said decree is reversed, &c. And this Court proceeding to pronounce such decree, as the said Superior Court ought to have made, is further of opinion, that the covenant contained in the articles, (whereby it is agreed, that all the estate, real and personal, of the said Frances, shall remain in the right and possession of the said Frances, during the continuance of the marriage, and the proceeds thereof, only, shall be applied to the support and maintenance of the said [John and Frances], and their issue, if any there be,) contains the declaration of the uses thereof, for that period only; and that the subsequent covenant (whereby the'said [John] doth further covenant and agree with the said [Frances] that he never will sell or dispose of any part of the said real or personal estate, (except as therein particularly excepted,) in any manner whatsoever; but that the same-shall always be held as an inviolable fund, for the support and maintenance of the said John and Frances, and their issue, if any there should be, applying only the proceeds or profits, without resorting to, or applying any of, the original stock for that purpose) must be understood and intended as a declaration of other uses, than those before described and limited; and the said [John] being equally within the "declaration of those other uses, as the said [Frances] '"or their issue, if any; he must, according to a just and proper construction of that clause, be intended to be-equally entitled to the benefit of those uses, as the others, for the full period of his natural life; during which, in the event of issue born of the marriage, he would have had a legal estate, in the lands, and real estate, as tenant by the curtesy, if he had not covenanted to have the rents and profits, certainly, in lieu of the personal estate, to which he must be understood as renouncing all his rights, and also in lieu of the chance of being tenant by the curtesy *718 of the real estate, in case he should have issue and survive his wife: that in decreeing- a settlement to be made pursuant to those articles, it is necessary and proper that the said articles should be carried into execution, fully, and not in part only. Therefore in the settlement to be directed, every limitation contained in,, or necessarily implied by, the articles, ought to be inserted ; and the articles so framed, as to preserve the contingent remainders thereby proposed to be Limited. That this can be done in no way so properly and effectually as by ordering and decreeing that the defendants [John R. Archer and Frances Cook, his wife] do, within a certain time to be limited by the said Superior Court of Chancery, by deed of bargain and sale, or other sufficient conveyance, convey to such person or persons as the said Superior Court of Chancery shall name as trustees for that purpose, all the estate, real and personal, which was of the said [Frances Cook] on the [*17th day of February, 1801], (except as in the said articles is excepted,) together with the progeny of the slaves, and the increase of the stocks of horses, cattle, sheep, and hogs, if any, which have come to the hands and possession of the said [John R. Archer, or Frances Cook] or either of them, or of any other person or persons, to the use of them or either of them; the lands and other real estate, in fee-simple, *and the slaves, and other personal estate, in absolute property; in trust, to permit the said [John R. Archer] to take and receive the rents, issues, and profits of the same during the joint lives of the said [John R. Archer, and Frances] his wife, and their issue, if any, without resorting to, or applying any of the original stock for that purpose; and, from and after the death of either of them the said [John and Frances] to permit the survivor to take and receive the rents, issues and profits thereof, in like manner, and for the like purpose, under the like restriction; and from and after the death of such survivor, to hold the said estate, real and personal, so to be conveyed to them, to the use of all and every child or children of the said [Frances Cook] born or to be born of her present [or any future] marriage, which shall be living at the time of the decease of the said [Frances Cook] and the descendants of such of the children of the said [Frances] as may die before her, (if any such there be,) as parceners, in parcenary,' agreeably to the sixteenth section of the act directing the course of descents; and, in default of such issue of the said [Frances] living at the time of her death,† [then and in that case to hold the whole of the estate so to be conveyed to them, in trust, for the use of the heirs of the said [Frances Cook] as parceners, in parcenary, agreeably to the directions of the beforementioned act of assembly; with remainders to trustees to preserve contingent remainders.] With liberty to the said trustees to apply to the said Superior Court of Chancery, from time to time for an injunction, or injunctions to stay waste, or to preserve the said estate, real and personal, by such restraints against alienation thereof, as may be necessary and proper; and that the several deeds and conveyances executed *by the said [J. R. A. and Frances Cook] or by any other
person or persons to them, or either of them, for the purpose of defeating the said marriage-articles, be brought into the said Superior Court of Chancery, and there can-celled ; and that the said Superior Court of Chancery do take such further order respecting the proof of the said deeds, and recording thereof in the District Court of Petersburgh, or the County Court of Amelia, or elsewhere, as in the opinion of that Court will best answer the purposes of preventing fraud and imposition in consequence of the proof of such conveyances, and admitting the same to record. And that the cause be remanded to the said Superior Court of Chancery, with directions to make and enter a decree pursuant to the principles herein stated, which is decreed and ordered accordingly.”
After the foregoing decree was pronounced, it was suggested by Hay and Wickham, that the decree was more extensive in its operation than was contemplated by the parties; inasmuch as it would require a settlement to be made of all the estate and interest of the wives, including as well that which had been allotted, as that held by Mrs. Tabb, in right of dower, and existing in outstanding debts. They contended, that, although the preliminary part of the articles mentioned all the estate, yet the specification “consisting” of such particular property, restricted their operation to that part which was specially enumerated. On the construction of deeds, they cited 3 Com. Dig. 330, Sheppard’s Touchstone, 74, 75, 85, Cowp. 819, Cooke v. Boosh. (a)
Call, contra, said it was unnecessary to refer to books, on this subject, as it was a mere question of intention, to be gathered from the words of the articles; which, he contended, passed the whole estate.
May 17th, 1809. JUDO® TUCKER delivered the following opinion on the construction of the articles:
Mr. Hay for the appellees in these two causes, moved the Court to revise and correct the decrees therein made on the *20th and 21st of April, upon this ground; that the Court had directed the whole of the estates which belonged to the appellees, Mrs. Randolph and Mrs. Archer, previous to their marriage, to be settled pursuant to the directions of those decrees, whereas the reversionary right of those ladies to a proportion of the estate held by their mother, Mrs. Tabb, for her life, was not included in the marriage-articles.
*719 This Court having unanimously established the principle that marriage-articles are to be considered only as the minutes, or heads of an agreement, which is to be carried into effect according to the true intent and meaning of the parties; and that for attaining that end, greater liberality is to be observed in the construction of them, than of deeds or other contracts, executed, we have only to consult the articles, in the present case, to know what was the real intention of the parties.
Those between Doctor Randolph and his lady recite, that, whereas a marriage is intended to be solemnized between the parties, ,and the said Bathurst is willing and desirous of securing and settling upon the said Mary and her heirs all her estate both real and personal, to which she is entitled, as one distributee of the estate of her late father deceased, except as therein after excepted ; in consideration of the said intended marriage, and for the intent and purpose aforesaid; the said Bathurst thereby covenants,” &c. Words more comprehensive cannot in my opinion be used ; they shew that it was the intention of the parties to settle the whole estate of the lady, real and personal, whether in possession, or reversion, or remainder, (except as in the articles excepted,) to the uses thereby declared. If any part of the estate was omitted in the enumeration of the particulars thereof, it was a mistake in the drawer, which ought to be corrected, according to the precedent established in the case of Flemings v. Willes, 2 Call, 5, recognised by this Court in the preamble to these decrees.
It was conceded by Mr. Hay, that the articles between Dr. Archer and his lady, were stronger than those which 'X'I have just noticed. I am therefore of opinion that the decrees were perfectly correct, and that no change ought to be made therein.
JUDGE) ROANE
observed, that the words of the recital were very broad, and he should have been of opinion that they would have been abridged by the specification, if nothing else had followed. But af-terwards the parties say, except certain property, naming it; by which the specification seems to have been given up; and then we can only resort to the recital, to explain the exception ; in doing which all the estate will be comprehended, except that particularly excepted.
JUDGE E'EEMING.
In the construction of agreements, the whole must be taken together ; and in viewing these it is my opinion, and the unanimous opinion of the Court, that the whole estate passes.

 2 P. Wms. 117, Eyre v. Countess of Scarborough.

 1 Eq. Cas. 390, Trevor v. Trevor; 1 P. Wms. 633, S. C.; lFearne. 78, 79; 1 Ponb. 202, 203, n. (p): 2 Powell on Contracts, 27; 3 Atk. 610, 611, Harvey v. Ashley.

 1 P. Wms. 633, 634; 3 Atk. 611.

 3 Atk. 187, 610, 611.

 3 Atk. 613.

 Legg v. Golwine, Cas. temp. Talbot, 20; 2 P. Wms. 349. West v. Erissey; 5 Ves. jun. 273, 276, Randal v. Willis.

 Trevor v. Trevor, 1 P. Wms. 631; Kentish v. Newman, 1 P. Wms. S34; Osgood v. Strode, 2 P. Wms. 257; Griffith v. Buckle, 2 Vernon, 13; Shelburne v. Inchiquin, 1 Bro. Ch. 338.

 2 P. Wms. 244.

 Prac. in Chancery, 237 ; 2 Vern. 480, S. 0.; 1 Eq. Oa. 63.

 Powell on Oont. 40.
Ibid. 41, Trevor v. Trevor; 1 P. Wms. 622; 1 Eq. Cas. Abr. 387, S. C., Bale v. Coleman; 1 P. Wms. 142, Seale v. Seale; Ibid. 290, Griffith v. Buckley; 2 Vern. 13, Osgood v. Strode; 2 P. Wms. 267, Jones v. Laugh-ton; 1 Eq. Cas. 392, Burton v. Hastings; Ibid. 393.

 1 Lev. 160, Ibid. 237.

 1 Atk. 265.

 3 Atk. 186.

 1 Atk. 268.

 2 P. Wms. 694.

 3 P. Wms. 211.

Note by Judge Tucker. The following- cases were mentioned and remarked upon by the Master of the Rolls in giving his opinion. 1 Salk. 151; 1 Vern. 298. Kettleby v. Atwood; Ibid. 471. S. G.; 2 Vern. 101, Lancy v. Fairchild; Ibid. 20. Knights v. Atkins; Ibid. 227, Symons v. Rutter; Ibid. 295, Chichester v. Bickerstaff; 1 P. Wms. 172, Lingen v. Sowray; 2 P. Wms. 171, Edwards v. Oonntess Warwick; 2 Vern. 322. Holt v. Holt; 2 P. Wms. 594, Vernon v. Vernon. — Note in Original Edition.

 3 P. Wms. 228; Cas. temp. Talbot. SO.

 2 P. Wms. 175.

 Tlardres, 395.

 Cited 2 P. Wms. 252.

 3 P. Wms. 255.

2 P. Wms. 257, 258.

 SCrui. Digest, 363; 3 Atk. 646, S. C.

 Trevor v. Trevor, 1 P. Wms. 622.

 1 P. Wms. 622; 1 Eq. Cas. 387.

 3 P. Wms. 213. 214.

 Per Lord Ch. Hordw. 3 Atk. 187; Goring v. Nash, Ibid. 611; Harvey v. Ashley, same doctrine.

 1 P. Wms. 632.

 3 P. Wms. 2ll.

 Long v. Colston, 1 Hen. & Munf. 121.

Cb) 1 Bro. Oh. Rep. 350, 351. See also 4 Bro. Ch. 244, 245, &c.

c) Goring v. Nash, 3 Atk. 186.

 2 Vern. 20,21, Knights v. Atkins.

 3 P. Wms. 217, 218.

 1 P. Wins. 633, Trevor v. Trevor.

 Vide Hodsden v. Lloyd, 2 Bro. Ch. 543, where articles somewhat like these were entered into.

 1 Font. 188, and 2 Call, 5, Fleming’s v. Willis,

c) 3 Atk. 575.

 3 Atk. 54.

 3 Atk. 611.

 Fearne. 78.

 2 Bridg. Dig. 9.

 Additional matter in the decree of Randolph and others v. Randolph and others.
Instead of the words, included within crotchets, at this mark * insert, “although the said Mary Randolph. then Mary Tabb, one of the parties thereto, was an infant at the time, yet being made by her with the privity, approbation and procurement of her mother and guardian, and being, moreover, beneficial to the said infant and her issue.” — Note in Original Editidn.

In the case of Randolph and others v. Randolph and others, "19th day of November, 1800.” — Note in Original Edition.

In the case of Randolph and other's v. Randolph and others, omit the words included’ thus, [ ] and insert, “then from and after the death of the survivor of the said Bathurst and Mary, the trusts so to be created, to cease and determine, and the estate, embraced by the said marriage-articles, and settlement so to be made, to descend and pass to such persons, and in such proportions, as if such articles and settlement had never been made.”— Note in Original Edition.

 Sed vide 5 Term Rep. 564, Clifton v. Walmes-ley et al.

-Same — Interest of Children. — The principal case is cited in Coutts v. Greenhow, 2 Munf. 369, to the point that children born before the marriage are not mere volunteers in a deed of marriage settlement, and therefore the deed, as to them, is not for that reason, void as to creditors. The principal case is cited in this connection in Paynes v. Coles, 1 Munf. 390.
Same — Same—Ascertaining Persons Who Are to Take. — wherever a devise is to the heir or next of kin, who take as purchasers, or wherever a strict settlement is to be made under articles by which the heir and next of kin are to take as purchasers, the law of inheritance, and the statute of distributions are referred to, to ascertain the persons who are to take. Boisseaus v. Aldridges, 5 Leigh 250, citing the principal case.